UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREGORY C. WASHINGTON                          CIVIL ACTION

VERSUS                                         NUMBER: 17-8734

NANCY A. BERRYHILL, ACTING                     SECTION: "H"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 23, 27).

Gregory C. Washington, Plaintiff herein, filed the subject application for DIB on December 6, 2014, alleging disability as of October 14, 2014.  (Tr. pp. 185-186, 200-202).  In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as a 100% Veteran's Administration ("VA") disability rating, depression, anxiety, migraines, cubital tunnel nerve damage on the right, an aversion to crowds, insomnia, upper/lower back pain, extreme daytime fatigue, and high blood pressure.  (Tr. 203-210).

Plaintiff's application for DIB was denied at the initial and reconsideration levels of the Commissioner's administrative review process on August 7, 2015 and November 3, 2015, respectively.  (Tr. pp. 112-120, 122-129).  Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on December 7, 2016 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 130-131, 31-72).  On April 3, 2017, the ALJ issued a written decision in

which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 10-30). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on June 6, 2017, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-7). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

(1)    Providing an RFC That Was Not Supported by Substantial Evidence; and

(2)    Making a Finding at Step Three That Was Not Supported by Substantial Evidence.

(Rec. doc. 23-2, p. 9).

Relevant to the resolution of the foregoing issues are the following findings that were made by the ALJ:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since October 14, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: post-traumatic stress disorder (PTSD); traumatic brain injury; migraines; right-sided weakness with hyporeflexia of unknown etiology; status-post ulnar nerve decompression [on the] right and right index finger surgery related to fracture; chronic low back pain of unknown/diagnosed etiology; obesity; hypertension; asthma; major depressive disorder; alcohol use disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds [that] the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following provisos: no more than occasional use of the right dominant upper extremity for pushing, pulling, operating hand controls, handling, fingering, and/or reaching in all directions; frequent climbing [of] ramps and stairs; no climbing [of] ladders, ropes, or scaffolds; occasional balancing; frequent stooping, kneeling, and/or crouching; no crawling; avoid all exposure to workplace hazards, such as dangerous moving machinery and unprotected heights; he can understand and perform simple, routine, repetitive tasks; he can maintain concentration, persistence, and pace to stay on task for periods of 2 hours at a time over the span of a typical 8-hour workday in order to perform such tasks; in a work setting that is low stress, which is further defined, in addition to the nature of the work being performed, as a work setting that is not production-paced or quota-based, rather, he requires a goal-oriented job that primarily deals with things rather than people; no more than occasional social interaction with supervisors, co-workers, and/or the public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on May 2, 1982 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 14, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 15, 16, 19, 24, 25, 26).

3

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries:  (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner, not the courts, to resolve.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is,

therefore, not disabled.   *Harrell*, 862 F.2d at 475.   In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. An individual who does not have a "severe impairment" will not be found to be disabled;

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. If an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made; and

5. If an individual's impairment precludes him form performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical records that were generated during the relevant time period begin with the report of a telephone contact Plaintiff had with a VA nurse Case Manager on October 14,

2014 in which he requested assistance in completing short-term disability paperwork. Plaintiff was at that time on leave pursuant to the Family Medical Leave Act ("FMLA") secondary to migraine headaches, cubital tunnel disease, and PTSD. (Tr. pp. 590-591). Plaintiff was subsequently seen at the VA Hospital for pain management on October 31, 2014, rating his pain as a "5" at the time, which became worse with prolonged sitting, walking, standing, or physical activity and was poorly controlled with medication. The assessment was chronic right arm and shoulder pain for which Plaintiff was referred to the orthopedic department for further evaluation; migraine headaches, stable on medications; and stable hypertension with unknown medication compliance. Plaintiff was to return as needed and his requested paperwork was completed. (Tr. pp. 583-589). On November 17, 2014, however, Plaintiff contacted his nurse Case Manager via telephone in a distraught state to report that a portion of his necessary paperwork had to be completed by an orthopedist and that the earliest appointment to have that accomplished was December 26, 2014. An earlier appointment date was secured and Plaintiff was advised accordingly. (Tr. pp. 582-583).

Plaintiff underwent an orthopedic consultation at the VA on November 28, 2014 in connection with his complaints of right elbow and back pain in addition to PTSD. The right elbow pain was worse with bending and lifting but prior radiographic studies revealed no abnormality to that site. A physical examination demonstrated a full range of motion to the elbow with pain over the nerve and medial humeral epicondyle, a positive Tinel's sign over the ulnar nerve, and no intrinsic atrophy. Strength was normal, sensation was intact, and non-radiating neck pain was produced with a Spurling's test. Deep tendon reflexes were +2, there was a full range of motion to the right shoulder, and negative straight leg raising could be accomplished to 70°. The diagnosis was medial epicondylitis and ulnar neuritis to the

6

right elbow.  Conservative treatment was recommended, including the continued use of Neurontin, and Plaintiff was to return in four months.  (Tr. pp. 578-582).  Plaintiff missed a mental health treatment appointment but was contacted via telephone on January 30, 2015 and was re-scheduled for March 16, 2015.  (Tr. p. 578).

On February 3, 2015, Plaintiff's sister, with whom he lived, was contacted telephonically in connection with her participation in the VA's Caregiver Support Program. She reported that Plaintiff had been out of work for many months due to his right arm injury and that he needed assistance with cooking, occasionally with dressing, and with caring for his children when they were in his custody.  For his part, Plaintiff advised of right arm problems since the previous spring resulting in him being unable to work and filing for disability benefits.  His sister had thus begun living with him to assist with household chores, cooking, driving him to appointments, and caring for his children.  The Caregiver Support Coordinator was to monitor Plaintiff's living situation.  The "Health Summary" from this date indicates that Plaintiff had been assigned a VA disability rating of 100% secondary to traumatic brain disease, a disability rating of 50% due to PTSD, and a rating of 10% each due to tinnitus and bronchial asthma.  (Tr. p. 575-577).  The Coordinator contacted Plaintiff again on February 13, 2015 who related that he was unable to do anything with his right arm due to nerve damage and that he suffered from migraine headaches almost daily in addition to PTSD.  He also indicated that he had a poor memory and tended to forget medical appointments.  Further assessments were to take place for Plaintiff's participation in the Caregiver Support Program.  (Tr. pp. 575-576).

Plaintiff was seen at the VA for a physical medicine rehabilitation evaluation on February 18, 2015 in connection with his complaints of right epicondylitis, right arm nerve

pain, and chronic low back pain.  Plaintiff was right-handed but was increasingly reliant on his left hand, including for picking up medications, and was said to need help with the activities of daily living.  His pain was rated as a "7" on this occasion but it increased to a "10" at times.  As a result of a motor vehicle accident Plaintiff had been involved in when he was stationed in Afghanistan, he was experiencing numbness, tingling, diminished strength, and odd sensations in his right arm.  He also experienced manipulation deficits such that he could not button his clothes and needed assistance in getting in and out of the tub, with toileting, shaving, and with all independent activities of daily living.  Plaintiff reported seven falls in the previous year in various locations in his residence.  A rehabilitation plan was put into place which included a trial of occupational therapy to address non-use of the right arm/hand and contractures forming in the PIP joints of the right hand.  (Tr. pp. 572-574).  A Veteran's Caregiver Assessment was performed on February 25, 2015.  Based upon the results of the evaluation, Plaintiff achieved a dependence level score of 8 which fell in the low level.  (Tr. pp. 565-572).

A "Caregiver Initial In-Home Assessment" went forward on March 13, 2015 during which it was noted that Plaintiff used a cane and needed assistance in ambulating and dressing.  He had also recently experienced difficulty with preparing meals, housework, shopping, and managing medications and finances.  Plaintiff's pain level at the time was rated as a "6" and he weighed in at 256 pounds.  His mobility concerns were the result of nerve damage in the right arm and leg which also affected his ability to safely drive a car.  Plaintiff's sister was also interviewed as part of the assessment.  During the evaluation, Plaintiff reported spending most of his days on a couch recliner and he had his eyes closed for most of the visit, presenting with a flat affect and depressed mood and with his sister tending to

all household chores and meals.  Plaintiff was approved at the Tier 1 level of assistance.  (Tr. pp. 555-565).

On April 29, 2015, Plaintiff was seen at the Physical Medicine Rehabilitation Clinic wherein it was noted that a recent MRI and NCS/EMG that were ordered for right upper extremity weakness and pain were grossly negative.  Plaintiff had been diagnosed with medial epicondylitis and ulnar neuritis of the right elbow and his pain and weakness on this date were similar to what they had been on his most recent visit.  Chronic low back pain also caused pain/weakness with ambulation.  Plaintiff was observed to ambulate with a straight point cane on the right side but there was no gross atrophy upon examination of the upper extremity and no edema or ecchymosis.  However, muscle strength was 3+/5 on right upper extremity testing with a positive Tinel's sign at the elbow and wrist.  Tapping produced tingling in the fingers, a cross-arm test elicited pain in the biceps, and there was limited active/passive range of motion with cervical movement.  Reflexes were 2+ and symmetrical. The assessment was unexplained right upper extremity weakness.  The plan was to obtain an updated MRI of the brain and an MRI of the cervical spine and Plaintiff was urged to follow up with the Neurology Clinic to explore other causes of his weakness.  Zanaflex was started but physical therapy was delayed until a more definitive diagnosis could be made.  (Tr. pp. 553-555).

Plaintiff underwent an MRI of the cervical spine and an MRA of the brain on May 7, 2015.  (Tr. pp. 487-488).  He subsequently presented to the Psychology Clinic on May 19, 2015 seeking a renewal of his Zoloft and to have a copy of his medical records sent to an unidentified place of employment.  (Tr. pp. 501-502).  Plaintiff appeared as a walk-in to the Neuropsychology Clinic on June 5, 2015, requesting a note for his unidentified employer

explaining that he had an upcoming appointment with a psychiatrist on July 9, 2015. (Tr. p. 501). Plaintiff was seen at the Mental Health Clinic on the aforementioned date for a suicide risk assessment. He was then taking Zoloft, Gabapentin, and Trazodone with fair efficacy but felt that the benefits of Zoloft had diminished. Plaintiff expressed ongoing difficulty managing anxiety, a depressed mood, irritability, hypervigilance, flashbacks, insomnia (four hours of sleep per night), and nightmares on a daily basis. He related to sometimes just sitting in the corner of his room staring at the ceiling fan; avoidance secondary to tinnitus, crowds, and socializing with others; and staying "turned up" all the time. Plaintiff also described an incident a year earlier in which he choked a man without provocation and had no recollection of the incident. He reported being out of work since October of 2014 and was in the process of applying for DIB/SSI benefits. Plaintiff also suffered from cognitive deficits in the form of poor memory and difficulty sustaining concentration as a result of a blast injury/traumatic brain injury which was further complicated by chronic pain and headaches. The "review of systems" portion of this treatment note was positive for chronic headaches, chronic neuropathic pain, and chronic neck and back pain. Upon mental status examination, Plaintiff exhibited slowed psychomotor activity, appeared tired and worried, and had slightly pressured speech with a slow rate and regular rhythm. His mood was described as "alright" and affect was constricted and anxious but insight and judgment were good and concentration and memory were intact. The assessment was PTSD and major depressive disorder, severe. Plaintiff was to be started on Valium and Seroquel, which was to be cross-titrated with Trazadone, and was continued on Zoloft and Gabapentin. Follow-up was to go forward with Plaintiff's primary care physician and a neurologist. (Tr. pp. 502-510).

On July 29, 2015, Plaintiff underwent a consultative psychological evaluation by David Johnson, a Licensed Psychological Associate, and Dr. Julia Brannon of the Pineview Psychological Services in Fayetteville, North Carolina. Plaintiff presented as a relaxed, polite, and cooperative individual who walked slowly with a cane and limped while he walked with a slightly unsteady gait. In providing his medical history, Plaintiff supplied much of the needed background information but had trouble recalling some specific dates and details. He reported seeing a psychiatrist on a monthly basis and a therapist every two weeks but had never been hospitalized in a psychiatric facility. Plaintiff had suffered multiple head injuries in the past, losing consciousness in a motor vehicle accident and on another occasion from a grenade explosion, being told at some point that he had brain damage. Surgical history included that to repair a broken finger to the right hand as well as to the right elbow in 2008/2009. Medications at the time included Valium, Neurontin, Seroquel, Zoloft, Trazadone, Cyclobenzaprine, HCTZ, Sumatriptan, Topiramate, Loratadine, Viagra, Fulnissolide, Methocarbamol, and Naproxen, drugs that left Plaintiff drowsy and unable to function.

Personally, Plaintiff was divorced after a marriage of seven years and he had four children, ages four, seven, eight, and 12. He had last worked for a warehouse doing some contract work for a couple of months in 2014. Plaintiff had consumed alcohol in the past but no longer did so and he denied drug use. In terms of daily activities, Plaintiff reported rising at 4:30 a.m. and usually eating one meal per day around 5:00 p.m. that his sister prepared. Plaintiff's sister also assisted him with bathing and dressing as needed. He reportedly did no housework or yardwork and did not watch TV or listen to the radio, exercise, or engage in any hobbies. Plaintiff occasionally visited with friends or talked on the phone with family

members but did not date or attend church. He related having concentration and sleep difficulties and often felt tired but did not take a nap.

On mental-status examination, Plaintiff was active and responsive with intact reality and did not appear to exaggerate or to minimize his symptoms significantly. Eye contact was limited, Plaintiff reported crying two or three times per week, and he felt anxious and depressed, the former more bothersome than the latter. Plaintiff rated his mood at a level of "6" on the day of the evaluation and he was less active and interested in things that he liked to do in the past. As a result of his time in the military, Plaintiff experienced PTSD symptoms, including flashbacks and nightmares, hypervigilance and an exaggerated startle response, feelings of detachment or numbness, and indications of survivor guilt. Plaintiff was also socially withdrawn, irritable, and felt helpless. Although Plaintiff denied suicidal or homicidal ideations, he did have thoughts of hurting others and recalled an incident in which he blacked out and choked someone with no immediate recall of the incident.

Plaintiff knew the date but thought it was Thursday when it was really Wednesday. He could remember five out of five items immediately after presentation but only remembered two items several minutes later. Plaintiff had fairly good recall of general information from the past but had trouble remembering other specific dates and details. He was somewhat forgetful but could fairly recall historical information. Intellectually, Plaintiff appeared to function within the average/high average range of intelligence and his judgment was relatively intact at the time. The diagnostic impression was PTSD with a history of panic symptoms; major depressive disorder, recurrent and moderate; alcohol use disorder, mild, versus alcohol use disorder, moderate, in early partial remission; and, in Axis IV, a deferred diagnosis regarding neurocognitive disorder. In their "summary and conclusion," the

evaluators opined that Plaintiff "… would have difficulty in many job settings given his presentation today." Ongoing anxiety was more problematic than depression and memory testing was recommended to better address his deficits in that area. The psychological evaluators deferred to the opinions of a physician regarding the extent to which Plaintiff's physical problems affected his ability to work. Outpatient mental health treatment was recommended and it was predicted that as long as Plaintiff did "… not resume abusing any mood-altering substances, he is likely capable of managing benefits appropriately in his best interest." (Tr. pp. 621-624).

On August 4, 2015, Plaintiff was seen again at the VA for a suicide-risk assessment and additional mental health evaluation. Chief complaints included anxiety, withdrawal, a dysphoric/irritable mood, and occasional panic attacks, exacerbated by chronic pain, when driving and in crowds. Plaintiff remained unemployed secondary to physical pain and social detachment/standoffishness. In terms of social functioning, Plaintiff had no real friends in the area but he did have an old army "buddy" whom he kept in contact with. He spent much of his time "sitting around." Plaintiff reported two incidents in the previous year in which he had attacked others and had no recollection of the incidents. Alcohol use had recently been curtailed and drug use was denied. Medical history was positive for migraines; pain and nerve damage to the arm, leg, and back; TMJ; traumatic brain injury; and hypertension. In the previous week, Plaintiff estimated the average severity of his pain to be a "7" which interfered with his activities of daily living at a level of "6." Plaintiff described numerous in-service events which satisfied the criteria of PTSD and he experienced various intrusion symptoms, trauma-related avoidance, trauma-related negative alterations on cognitions-mood, and trauma-related arousal and reactivity. Panic attacks occurred monthly. On

mental status examination, Plaintiff was cooperative, alert, and oriented and did not evidence any significant memory problems.  His affect was mildly blunted, mood was mildly depressed, and hallucinations, delusions, and suicidal ideations were denied.  The DSM-5 diagnosis was PTSD exhibited through a full range of symptoms.  Plaintiff was to be admitted to the VA's PTSD Program to better address his intrusive thoughts, anxiety, and depression. (Tr. pp. 523-531).

On August 19, 2015, Plaintiff completed the SSA's "Function Report-Adult" form that is designed to elicit information about how his conditions limited his activities.  On the form, Plaintiff indicated that he required assistance with a range of self-care activities, including dressing, bathing, shaving, feeding himself, and toileting.  Cooking, housework, and yardwork were performed by Plaintiff's caregiver who handled the shopping and finances as well.  Plaintiff reported that his conditions affected his ability to perform all of the abilities enumerated on the form as well as his ability to concentrate, follow instructions, and handle stress.  Prescribed medications caused various side-effects.  Plaintiff also recalled at least two instances in which he had flashed back, blacked out, and hurt someone.  (Tr. pp. 218-225).

On August 21, 2015, a social work triage assessment was conducted after Plaintiff contacted his case manager and complained of the accuracy of certain information contained in his medical record.  Plaintiff was counseled on the proper protocol for requesting an amendment to the record.  A monitoring assessment of the Caregiver Support Program was also conducted during which it was reported that there had been no change in Plaintiff's ability to perform the activities of daily living and that his sister still needed to assist him with personal hygiene and, at times, in getting dressed.  (Tr. pp. 496-501).

Plaintiff was seen for further mental health treatment on September 22, 2015, arriving 10 minutes late for his scheduled appointment and accompanied by a friend. Treatment goals and barriers were discussed. Plaintiff endorsed passive suicidal ideation but without a specific plan and intent. He also recalled several incidents in the previous year in which he engaged in physically aggressive behavior without memory of his actions, the most recent one being when he was at home alone and woke up to find various things broken and rearranged. Plaintiff exhibited a somewhat irritable mood and was somewhat guarded when disclosing information. There was no evident psychosis, speech problems, or psychomotor agitation. Plaintiff endorsed passive suicidal thoughts but denied a specific plan, intent, or rehearsal. The diagnosis was PTSD by history. (Tr. pp. 514-516). Plaintiff returned to the VA for individual PTSD therapy on October 6, 2015, reporting being in considerable pain ("8") during the session as evidenced by his facial expressions and restlessness throughout. Toward the end of the appointment, Plaintiff stood up and paced around the room in an attempt to distract himself from the discomfort. Nevertheless, Plaintiff was engaged in the session and was generally receptive to the information being offered despite presenting with a guarded and somewhat irritable mood. A follow-up session was scheduled. (Tr. pp. 511-513). Plaintiff also underwent a medication check by a VA physician who reported compliance with no side effects but symptoms that were largely unchanged. Plaintiff complained of extreme irritability, constant depression, and feelings of isolation and was observed to be squinting his eyes and grimacing secondary to headache pain. Plaintiff's medications were adjusted. (Tr. pp. 522). He missed a follow-up clinic appointment scheduled for October 13, 2015. (Tr. p. 510).

Plaintiff presented to the VA emergency room in Fayetteville on January 14, 2016, complaining of a migraine headache of two days' duration as well as right arm and lower back pain. In the previous six months, Plaintiff had experienced back pain radiating into the right leg accompanied by loss of bowel control and numbness and tingling in the right foot and arm. He rated his headache pain as a "9" with photophobia, phonophobia, and peripheral visual disturbance. Upon physical examination, Plaintiff had right arm weakness and pain with movement as well as right arm and leg sensory deficits to light touch. Tenderness to the spine was present starting at the T10 level. A CT scan of the lumbar spine was performed, revealing no acute abnormality, no evidence of fracture or dislocation, and no significant central canal or neural foramen narrowing. Plaintiff was administered a dosage of Imitrex and his headache pain decreased to a "3" to "4." The discharge diagnosis was migraine headaches, back pain, and arm pain. (Tr. pp. 848-864, 818-826, 739).

On March 19, 2016, Plaintiff had an initial visit with a new primary care physician at the VA Medical Center in Fayetteville. Complaints at the time included 6/10 chronic pain to the neck due to headaches and lower back pain that radiated down the right leg. A physical examination produced largely unremarkable results. PTSD testing was grossly positive in every testing area. The assessment was PTSD/depression/insomnia, headaches, TMJ, lower back issues, hydrocele, and asthma. Additional testing was ordered and Plaintiff was to return in 60 days. (Tr. pp. 744-756). A suicide risk screen/assessment via telephone was done on March 21, 2016 as a result of which it was determined that Plaintiff was at minimal risk for suicidal behavior at the time. (Tr. pp. 742-744).

Plaintiff underwent a neurological consultation at the VA Clinic on March 23, 2016, complaining of headaches, migraines, and right upper extremity ulnar neuropathy. The right

16

elbow pain was worse with bending and lifting.  Upon physical examination, Plaintiff had a full range of motion in the right elbow with pain throughout the nerve and medial humeral epicondyle.  There was a positive Tinel's sign at the elbow over the ulnar nerve but no intrinsic atrophy.  Strength was normal and sensation was intact.  The diagnosis was medial epicondylitis and ulnar neuritis of the right elbow.  Conservative treatment was continued, including the use of Neurontin.  (Tr. pp. 731-734, 826-827).

On April 20, 2016, Plaintiff returned to the VA Urgent Care Clinic complaining of a worsening chronic migraine headache on the right with peripheral blurry vision and pain at a level of "10" that was not relieved with Imitrex and Topamax.  Plaintiff was referred to the Urgent Care Clinic for an injection and was instructed to obtain a Gabapentin refill.  (Tr. pp. 726-730, 803-806).  Plaintiff presented to the VA Access Clinic the following day, reporting that his headache pain had lessened to a "6" and that he had left the Urgent Care Clinic after waiting for 2.5 hours.   The headache pain was right-sided and associated with photo/phonophobia, nausea, and blurred peripheral vision.  Plaintiff continued to take Topirimate and Sumatriptan which were not helpful and he used Imitrex every other day.  He also reported that he had fallen two weeks earlier due to his legs giving out on him, an occurrence that had happened before without any warning.  It was determined that Plaintiff was at a high risk of falling.  The assessment was both migraine and tension headaches; right sided weakness and hyporeflexia; and, PTSD.  Plaintiff was prescribed Naproxen and was continued on Topamax and he was administered an injection of Sumatriptan.  An MRI of the brain was to be ordered along with a neurological consultation.  (Tr. pp. 713-726, 791-802).

Plaintiff appeared for the noted neurological consultation on May 19, 2017.  He endorsed headaches on the right working from the back to the front which were stabbing

and accompanied by pressure and nausea and preceded by an aura of flashes and tunnel vision. The occurrences lasted anywhere from four hours to two or three days with associated photophobia, phonophobia, and osmophobia; irritability; and pain in the arm, leg, and back. Severe headaches occurred twice per month, requiring him to retreat to a quiet, dark room, with lesser headaches occurring two to three times per week. Plaintiff reported doing okay until he started working for Shell where his condition was allegedly used against him by a coworker. A neurological examination was essentially insignificant. The diagnosis was migraine headaches with aura. Plaintiff was prescribed Amitriptyline and Zolmitripton and was advised to keep a headache diary. (Tr. pp. 708-713- 781-784).

On June 23, 2016, Plaintiff underwent an MRI of the lumbar spine which produced no evidence of lateralizing disc protrusion, spinal stenosis, neuroforminal narrowing, or significant degenerative changes. (Tr. p. 889). Plaintiff returned to the VA Clinic on July 16, 2016, complaining of chronic neck/low back pain. Physical examination revealed mildly diminished right hand grip strength and limited flexion to the low back but no muscle spasm and no weakness in the legs. The assessment was PTSD; migraine headaches for two years at a rate of one to two per week; chronic neck/low back pain radiating to the right arm and leg following an on-the-job injury in 2014 for which Plaintiff had been on workers' compensation for a year and was pursuing a claim for disability; suspected obstructive sleep apnea; and epididymal cysts. Further testing was to be pursued and Plaintiff was to return for follow-up in nine months. (Tr. pp. 882-885).

The final treatment note in the administrative record documents Plaintiff's mental health assessment at the VA Clinic in Fayetteville on September 13, 2016. Plaintiff arrived one hour late for the appointment and proceeded to provide the evaluating physician with a

description of his service-related symptoms of PTSD, including repeated and disturbing memories of traumatic experiences, hypervigilance, a tendency to be startled easily, hyperarousal, sleep difficulties, nightmares, flashbacks, and nightly, vivid combat-related dreams. Plaintiff did not do well in groups, avoided crowds, and preferred by be by himself. He reported crying spells at least three to four times per month, anhedonia, low energy and motivation, and survivors' guilt. Alcohol and drug abuse were denied. Upon mental status examination, Plaintiff presented as restless but cooperative with normal speech and appropriate behavior. Mood was anxious and depressed, affect was appropriate but constricted, and thought content was normal as were insight/judgment, intelligence, and abstraction. Suicidal and homicidal ideations were denied. The diagnosis was PTSD and major depressive disorder. The dosage of Plaintiff's Amitriptyline was increased and he was started on Prazosin and Wellbutrin. Plaintiff was to be continued on mental health treatment. (Tr. pp. 871-876).

A hearing *de novo* before an ALJ went forward in this matter on December 7, 2016 in Fayetteville. The records that were then extant were formally admitted into evidence and the ALJ agreed to leave the record open for two weeks for any supplementation that may be needed. After the VE was conferenced in telephonically, Plaintiff took the stand and was questioned by the ALJ. He was 34 years of age at the time and had a four-year college degree from West Point. Plaintiff was then questioned regarding his work history. After attaining the rank of captain and leaving the military around 2011, he began working for Shell as a "materials lead" overseeing equipment and inventory for various projects. The ALJ then noted Plaintiff's VA disability ratings of 100% due to traumatic brain injury, 50% due to PTSD, and some other ratings as well. Plaintiff recalled suffering from chronic migraines

even before he began working for Shell where he managed equipment warehouses on the gulf, a physically demanding job that was made more difficult due to the nerve damage in his right arm and side and subsequent conflicts with a female co-worker that further exacerbated his medical issues. Over time, medications became ineffective in controlling Plaintiff's symptoms and he ended up going on leave under the FMLA and eventually on short-term disability.

Physically, Plaintiff testified to suffering a fracture to a finger on his dominant hand that required surgery and ulnar nerve decompression in 2010. He described the weakness and pain on his right side as radiating down from his neck into the upper extremity and the ALJ observed, and Plaintiff confirmed, that he did not use that arm for much of anything due to what he described as excruciating pain. Plaintiff had recently undergone nerve conduction studies but was unaware of the results. He testified to ongoing difficulty with activities involving the use of his hands, including typing, cooking, cleaning, and occasionally with grooming, a depressing circumstance given that Plaintiff was once the captain of his football team. Personally, Plaintiff continued to reside with his sister and he had visitation privileges with his three children, aged five to 13 years. He testified that his sister assisted him with caring for his children and with cooking, some grooming matters, with finances, and with the majority of driving. Incapacitating migraines occurred at a rate of two to three times per month but lesser headaches occurred on an almost daily basis. Plaintiff identified a host of medications that he took in an attempt to manage his symptoms.

Continuing, Plaintiff testified to his ongoing struggles with PTSD and depression and the events that preceded them, resulting in anger, irritability, sleep difficulties, flashbacks, and hypervigilance, all of which had been treated with medication and therapy over the

years.  Even with medication, Plaintiff testified that he only slept two to three hours per night.

He preferred family-based assistance over VA support groups.  Medication side effects

included drowsiness, nausea, and decreased cognition.  Plaintiff's attorney had no questions

for his client.  (Tr. pp. 33-58).

Robert Edwards, a VE, was the next witness to take the stand.  After clarifying the

demands of Plaintiff's past work as a warehouse manager, Edwards classified that job, as

actually performed, as skilled and medium in exertion and Plaintiff's past position as an

Army infantry unit leader as skilled and very heavy in exertion.  The ALJ then posed a

hypothetical question to the VE which assumed an individual of Plaintiff's age, education,

and work experience who could only occasionally use his right upper extremity; who could

frequently climb ramps and stairs but could not climb ladders, ropes, and scaffolds; who

could only occasionally balance; who could frequently stoop, kneel, and crouch but could not

crawl; who was to avoid all exposure to workplace hazards; and, who could understand and

perform simple, routine, repetitive tasks and maintain concentration, persistence, and pace

such that he could stay on task for two hours at a time over the span of a normal eight-hour

workday sufficient to perform tasks in a low-stress work setting that was not paced or quota-

based but was goal-oriented and primarily involved things rather than people with no more

than occasional social interaction with supervisors, co-workers, and the public.  Faced with

that lengthy hypothetical, Edwards testified that the individual described therein could not

perform Plaintiff's past occupations.  However, the described individual could function as an

unarmed security guard or a clerical checker, jobs of an unskilled, light nature, with the

available numbers of such positions being reduced to account for only occasional reaching,

handling, and fingering.  In the unskilled, sedentary category, the VE testified that the

individual described in the hypothetical question could also function as a surveillance system monitor.

In the second hypothetical question posed to the VE the ALJ reduced the individual's ability to use the dominant right upper extremity from occasional to only rarely. In light of that increased restriction, Edwards testified that the described individual could not perform the light-based jobs that he had previously identified but could still function as a surveillance system monitor but with a 50% reduction of the 112,000 of such positions available nationally. On a separate work-related requirement, the VE testified that there would be no jobs that a person could perform if he missed two or more days of work per month. In response to another inquiry from the ALJ, Edwards testified that work would be precluded if an individual was not able to reliably stay on task for periods of two hours at a time over the span of a typical eight-hour workday, even to perform simple, routine, repetitive tasks. (Tr. pp. 59-67).

After being tendered to Plaintiff's counsel for additional questioning, the VE was asked whether any type of state certification was required for the sedentary-level surveillance system monitor position. In answer thereto, the VE testified that training and testing were typically required by the state as part of the job requirements. When asked whether the position could accurately be characterized as unskilled in light of those requirements, Edwards testified that he had recently done research on the topic and that a number of such jobs still existed. (Tr. pp. 68-69). As mentioned at the outset of the hearing, the ALJ agreed to leave the record open for a brief period of time for the submission of any additional medical records. (Tr. pp. 70-71).

As noted earlier, Plaintiff challenges the ALJ's decision to deny him Social Security benefits on two grounds. In the first of those, Plaintiff argues that the ALJ arrived at a residual functional capacity ("RFC") assessment that was not supported by substantial evidence. Under the rubric of that challenge, Plaintiff further argues that the ALJ erred by not adequately assessing the VA rating of 100% disability in arriving at his decision. Finding the latter challenge to have merit, a discussion of Plaintiff's first challenge will be pretermitted and it will be recommended that Plaintiff's case be remanded to the Commissioner for further proceedings.

Under the law of the Fifth Circuit, an ALJ is required to consider a disability determination made by the VA:

> A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ. *See Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981). In *Rodriguez* and its progeny, we have sometimes referred to a disability determination as being entitled to "great weight." While this is true in most cases, the relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case. Since the regulations for disability status differ between the SSA and the VA, ALJs need not give "great weight" to a VA disability determination if they adequately explain the valid reasons for not doing so.

> *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2000).

Similarly, under the SSA's applicable rules, disability determinations made by other agencies are required to be considered:

> ... we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and

nongovernmental agencies ... Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

SSR – 06-03 p., 2006 WL 2329939 at *6.[1]

Citing exhibit Nos. 1F/18 and 2D that were admitted in the administrative proceedings below, the ALJ in the present case properly noted that the record included VA disability ratings of 100% due to traumatic brain disease, 50% due to PTSD, and 10% each due to asthma, eczema, and tinnitus. (Tr. p. 23). [2] The exhibits cited by the ALJ are: 1) a page denominated "Consult Requests" from a batch of VA medical records on which the percentages of Plaintiff's service-related disabilities are noted (tr. p. 491), and 2) a letter dated March 2, 2015 from the VA to Plaintiff which contains the dates of his service and 100% service-connected disability rating for his use in applying for other benefits such as tax relief, etc. (Tr. p. 187). The ALJ then goes on to note that the SSA is not bound by the VA's findings because the standards used by the agencies are different and, in any event, the determination of whether a given claimant is disabled is the ultimate issue that is reserved to the Commissioner in a disability proceeding. (Tr. p. 23). Ultimately, the ALJ gave only "partial weight" to the VA's disability ratings because, "[w]hile the record does demonstrate some ongoing weakness in the right-sided extremities, which warrants exertional, postural,

---

[1] The Court notes that the Social Security Regulations were revised in 2017 to make clear that an ALJ need not provide any analysis of a VA disability rating. The rule as amended now states that "... in claims filed ... on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled ..." 20 C.F.R. §1504. As Plaintiff filed his application for DIB prior to March 27, 2017, the amended rule is inapplicable. *See Hines v. Berryhill*, No. 16-CV-0935, 2018 WL 2437672 at *3 (S.D. Miss. May 9, 2018), *adopted*, 2018 WL 2436462 (S.D. Miss. May 30, 2018).

[2] Earlier on in his written decision, the ALJ also cited exhibit No. 1F/18 in finding that asthma, eczema, and tinnitus were not severe impairments notwithstanding the VA's 10% disability ratings for each of those conditions. (Tr. pp. 15-16).

and manipulative limitations as well as continued mental health complaints, the degree of disability opined by the Department of Veterans Affairs is overall inconsistent with the objective medical evidence, which shows generally mild findings otherwise and only intermittent treatment." (*Id.*). Admittedly, in reaching the conclusions that he did, the ALJ discussed the majority of the evidence that was before him, including the reporting information elicited by the SSA's forms, voluminous medical records from the VA and from Plaintiff's consultative evaluations, findings from state agency medical consultants, correspondence to and from Plaintiff's long-term disability insurance carrier, and at least some of his hearing testimony. (Tr. pp. 15-26).

As directed by *Chambliss*, "... ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so." *Chambliss*, 269 F.3d at 522. "[T]he VA's actual 'disability' determination is not what is significant to the ALJ; rather, it is the reasoning and medical records that support the VA's finding." *Branton v. Astrue*, No. 11-CV-0085, 2012 WL 4813833 at *3 (N.D. Tex. Apr. 27, 2012), *adopted*, 2012 WL 4813771 (N.D. Tex. Oct. 10, 2012). In the matter at hand, although the ALJ had a wealth of VA medical records as well as other evidence before him, it does not appear that he had the benefit of, nor is the Court directed to, the actual decision of the VA awarding Plaintiff benefits and discussing the medical evidence and its reasons for arriving at the disability ratings that it did. Courts typically refer to such documentary evidence as "[D]isability [R]ating [D]etermination [L]etters," *Rasco v. Berryhill*, No. 17-CV-0946, 2018 WL 587948 at *2 (S.D. Tex. Jan. 5, 2018), *adopted*, 2018 WL 560400 (S.D. Tex. Jan. 25, 2018), a VA "Rating Decision," *Clark v. Colvin*, No. 13-CV-0111, 2014 WL 122020 at *4 (E.D. La. Jan. 13, 2014), or the "Reasons and Bases" upon which disability was granted. *Albo v. Colvin*, No. 12-CV-0066,

2013 WL 5526584 at *1 (N.D. Tex. Sept. 30, 2013 WL 5526584 at *1 (N.D. Tex. Sept. 30, 2013).  The rationale behind these decisions is that "… <u>some level of discussion and/or scrutiny of the VA disability determination is required</u>;" "[s]tated differently, the ALJ, if he determined the VA rating should not be adopted, needed to set out why the evidence used by the VA was not credible, something he could not do without knowing the basis of the VA's determination."  *Id.* at *8 (emphasis in original); *see also Ayala v. Berryhill*, No. 17-CV-0783, 2018 WL 1470626 at *5-7 (N.D. Tex. Mar. 3, 2018), *adopted*, 2018 WL 1457246 (N.D. Tex. Mar. 23, 2018).  Consistent with the weight of the aforementioned authorities, it will be recommended that Plaintiff's case be remanded to the Commissioner for further proceedings consistent with the Court's opinion.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Defendant's motion for summary judgment be denied, that Plaintiff's motion for summary judgment be granted in part, and that Plaintiff's case be remanded to the Commissioner for proper consideration of the VA's disability rating and determination.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79

F.3d 1415 (5th Cir. 1996)(en banc).[3]

      New Orleans, Louisiana, this __27th__ day of _____November_____, 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[3] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.